IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



SENATOR AMANDA F. CHASE,

    Plaintiff,

v.                                     Civil Action No. 3:21-cv-54

SENATE OF VIRGINIA, et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANTS' MOTION TO DISMISS ("Motion to Dismiss") (ECF No. 12). For the reasons set forth below, the motion will be granted.

**I.**     **BACKGROUND**

**A.**   **Legal Standard**

The Defendants' Motion to Dismiss is brought pursuant to Fed. R. Civ. P. 12(b)(1) ("lack of subject-matter jurisdiction"). A 12(b)(1) motion can be characterized as either a "facial" or a "factual" challenge to a court's subject matter jurisdiction. Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). A facial challenge argues that the complaint fails to allege facts sufficient to support a finding that a court has subject matter jurisdiction. Id. Thus, if the Rule 12(b)(1) motion is a facial challenge, "'the plaintiff, in effect, is afforded the same procedural protection as he would

receive under a Rule 12(b)(6) consideration.'" Id. (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). That is, the factual allegations of the complaint are treated as true. Id. In contrast, a factual challenge argues that the "'jurisdictional allegations of the complaint'" are not true. Id. (quoting Adams, 697 F.2d at 1219). Accordingly, in a factual challenge, there is no presumption that the facts in the complaint are true. Id.

During oral argument on the Motion to Dismiss, Defendants agreed that their motion was a facial challenge to subject matter jurisdiction under Rule 12(b)(1). Therefore, the factual allegations in the Plaintiff's Civil Rights Complaint 42 U.S.C. § 1983: FIRST & FOURTEENTH AMENDMENT (the "Complaint") will be accepted as true and will be viewed in the light most favorable to Plaintiff Senator Amanda F. Chase.

**B. Summary of the Alleged Facts**

Chase is currently the State Senator for the Eleventh Senatorial District in the Commonwealth of Virginia. Compl. ¶ 1, ECF No. 1. She first served as a state senator in 2016 and then was reelected in 2019 to serve for an additional four-year term. Id.

On January 6, 2021, Chase attended a political rally in Washington, D.C. See id. ¶ 11. On January 13, 2021, it was charged by the Virginia Senate that Chase "addressed a crowd

gathered in Washington, D.C., to urge that action be taken to overturn the lawfully conducted 2020 presidential election." Senate Resolution 91 (the "Original Censure"), ECF No. 6.

According to the Original Censure, "the morning's events were a catalyst to the deadly insurrection that followed." Id. Thus, the Original Censure proposed to censure Chase for "fomenting insurrection against the United States." Id. According to the Original Censure:

> [T]he inflammatory statements and actions of Senator Amanda F. Chase before, during, and after the events that led to the insurrection at the United States Capitol on January 6, 2021, constitute a failure to uphold her oath of office and conduct unbecoming of a Senator.

Id.

On January 13, 2021, the Original Censure was referred to the Privileges and Elections Committee. Compl. ¶ 11, ECF No. 1. On January 19, 2021, the Privileges and Elections Committee conducted "a minimal hearing" based on the allegations in the Original Censure. Id. ¶ 13. "Plaintiff was not advised nor afforded the right to be represented by counsel at the committee meeting." Id. That same day, the Privileges and Elections Committee voted to send the Original Censure to the floor of the Senate. Id.

On January 25, 2021, the Original Censure was read on the Senate floor. Id. ¶ 15. But, on January 26, 2021, a different

3

censure (the "Substitute Censure") (ECF No. 1-3) was read instead.[1] Id. ¶ 16.

The Substitute Censure "complained of substantially broader allegations of disorderly behavior" and included conduct that occurred prior to Chase's reelection in 2019. Id. ¶ 17. Specifically, the Substitute Censure purported to censure Chase for "a series of [eight] incendiary incidents" spanning from March 22, 2019 to early January 2021. Substitute Censure, ECF No. 1-3. According to the Substitute Censure, those eight incidents — all premised on statements made by Chase (i.e., speech):[2]

> [H]ave created and aggravated tensions, misled constituents and citizens, and obstructed the Senate's business in service of the Commonwealth, and such behavior constitutes a failure to uphold her oath of office, misuse of office, and conduct unbecoming of a Senator and, collectively, has caused a material effect upon the conduct of her office.

Id.

The allegations in the Substitute Censure were never investigated by the Privileges and Elections Committee. Compl. ¶ 18, ECF No. 1. Because of this, on January 27, 2021, "the

---

[1] Neither the Complaint, the briefs, nor argument supplies the reason for replacing the Original Censure with the Substitute Censure.

[2] At oral argument, the Defendants acknowledged that each of the eight incidents was "speech."

4

President of the Senate ruled that the Substitute Censure did not comply with Senate Rules 18(h) and 53(b)." Id. ¶ 19.

However, for reasons neither explained nor readily apparent from the record, the President of the Senate was overruled by a 29-8 vote. Id. ¶ 19, n.4. The Senate then voted to approve the Substitute Censure. Id. ¶ 20. The Substitute Censure was not read three times before being decided by the Senate. Id. ¶ 20, n.5.

As a consequence of the Substitute Censure, Chase was "demoted to a rank equivalent to that of a newly elected Senator."[3] Id. ¶ 21. At the time the Complaint was filed, Chase had been relieved of all previous committee assignments. Id. ¶ 21, n.6.

Chase then filed this action against the Senate of Virginia and the Honorable Susan Clarke Schaar, the Clerk of the Senate of Virginia, in her official capacity, who "maintains an official public record journal of proceedings of the Senate of Virginia." Id. ¶ 3. Chase seeks a declaration that: (1) the

---

[3] Under the rules of the Senate, the loss of seniority would appear to be a mandatory result of a censure. See Va. Senate R. 18(h) ("The Senate as a whole shall then consider the resolution, and, by recorded vote, either defeat the resolution or take one or more of the following actions: (i) reprimand the Senator with a majority vote of the Senators present and voting; (ii) censure the Senator and place the Senator last in seniority with a majority vote of the elected membership of the Senate; (iii) expel the Senator with a two-thirds vote of the elected membership of the Senate . . . .") (emphasis added).

Substitute Censure violated Chase's rights under the First Amendment to the United States Constitution; and (2) she did not engage in "Disorderly Behavior pursuant to Article Four Section 7 of the Virginia Constitution." Id. ¶¶ VII(b)-(c). Chase also seeks (3) an injunction against Schaar "from allowing the publication of [the Substitute Censure] in the official journal of the Virginia Senate;" and (4) an order directing Schaar (a) "to expunge the Substitute Censure and the Original Censure from the Public record and the official journal of the Senate;" and (b) "to reinstate [Chase's] seniority rank." Id. ¶¶ VII(a),(c)-(e).

In keeping with the precept that the Court is to view the facts in the light most favorable to Chase, the Court will accept, without deciding, Chase's allegation that the Senate of Virginia violated its own rules by censuring her even though the Substitute Censure had not been read three times or "referred to any committees for investigation, including the Privileges and Elections Committee." See id. ¶¶ 14, 18. And, based on the text of the Substitute Censure and the acknowledgement of counsel for the Defendants at oral argument, the Court accepts

6

that Chase was censured because of the eight items of speech recited in the Substitute Censure.[4]

The DEFENDANTS' MOTION TO DISMISS must be decided in perspective of the foregoing facts and any reasonable inferences that can be drawn from them.

## II. DISCUSSION

Defendants argue that the Court lacks jurisdiction to entertain Chase's suit on two related, though independent, grounds: (1) the suit presents a non-justiciable political question; and (2) both defendants are entitled to some form of immunity. If the defendants are right on either ground, the Court lacks subject matter jurisdiction. For the reasons that follow, the Court finds that the Senate of Virginia is entitled to sovereign immunity and that the Clerk of the Senate is entitled to both sovereign immunity and absolute legislative immunity.

### A. Sovereign Immunity

#### 1. Senate of Virginia

Under the well-established doctrine of sovereign immunity, a state cannot be sued in federal court by one of its own citizens without the state's consent. <u>Edelman v. Jordan</u>, 415 U.S. 651, 662-63 (1974) (re-affirming "that an unconsenting

---

[4] The Substitute Censure uses the terms "pattern of unacceptable conduct" and "actions," but the basis of the censure was Chase's speech.

7

State is immune from suits brought in federal courts by her own citizens"). The doctrine of sovereign immunity applies without regard to the form of relief sought by the plaintiff, Seminole Tribe v. Florida, 517 U.S. 44, 58 (1996), and even if the action is brought under 42 U.S.C. § 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 66-67 (1989) ("We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent."). The doctrine also extends to the "arm[s] or instrumentalit[ies] of the State." Lewis v. Clarke, 137 S. Ct. 1285, 1291 (2017).

Here, the Commonwealth of Virginia would be entitled to sovereign immunity. Because this is a suit brought by a private Virginia citizen, the Commonwealth of Virginia could not have been sued absent some exception to the doctrine of sovereign immunity. Edelman, 415 U.S. at 662-64. For a suit against the state itself, where the state has not consented to be sued, the only possible exception in play would be that the suit was brought pursuant to a statute adopted under the Fourteenth Amendment. Here, the suit was indeed brought pursuant to such a statute (i.e., 42 U.S.C. § 1983); however, the Supreme Court has already held that a § 1983 suit will not override state sovereign immunity under the Eleventh Amendment. Will, 491 U.S. at 66-67. Thus, the Commonwealth of Virginia would have been immune from this suit had it been named as a defendant.

8

As Chase acknowledged during oral argument, the Senate of Virginia is not merely an instrumentality of the Commonwealth of Virginia; rather, as reflected in the Virginia Constitution, the Senate is a constituent part of the Commonwealth. VA. CONST. art. III, § 1 ("The legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others . . . ."); VA. CONST. art. IV, § 1 ("The legislative power of the Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and House of Delegates."). Accordingly, the Senate of Virginia is entitled to the same sovereign immunity as the Commonwealth.

### 2. Clerk of the Senate

A state employee sued in his or her official capacity may also be entitled to sovereign immunity. Lewis, 137 S. Ct. at 1291-92 (citing Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)). However, under the oft-invoked Ex parte Young exception, sovereign immunity will not apply to a state officer where a suit is brought against the state officer in his or her official capacity for an ongoing violation of federal law that can be cured by prospective injunctive relief. DeBauche v. Trani, 191 F.3d 499, 505 (4th Cir. 1999). Conversely, "the exception does not permit federal courts to entertain claims seeking retrospective relief, either compensatory or other, for completed, not presently ongoing violations of federally-

9

protected rights." Republic of Paraguay v. Allen, 134 F.3d 622, 627 (4th Cir. 1997). Nevertheless, "the difference between the type of relief barred by the Eleventh Amendment and that permitted under Ex parte Young will not in many instances be that between day and night." Edelman v. Jordan, 415 U.S. 651, 667 (1974)). The applicability of the Ex parte Young exception must be "tailored to conform as precisely as possible to those specific situations in which it is 'necessary to permit the federal courts to vindicate the federal rights and hold state officials responsible to the supreme authority of the United States.'" Papasan v. Allain, 478 U.S. 265, 277 (1986) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105 (1984)) (internal citation marks omitted). Thus, "[i]n discerning on which side of the line a particular case falls, we look to the substance rather than to the form of the relief sought . . . and will be guided by the policies underlying the decision in Ex parte Young." Papasan v. Allain, 478 U.S. 265, 279 (1986).

Here, although Chase purports to be seeking prospective relief, in substance, she is functionally seeking retrospective relief for a completed (i.e., not presently ongoing) alleged violation of her federal constitutional rights. At oral argument on the Defendants' Motion to Dismiss, Chase argued that there were two ongoing constitutional violations:

10

her loss of seniority and her alleged reputational harm.[5] However, both the loss of seniority and the alleged reputational harm are ongoing <u>consequences</u>, not ongoing violations. The actions at issue had been completed by the time the suit was filed. See Paraguay, 134 F.3d at 627-28 (noting that, although there were ongoing consequences of an alleged violation of a federal treaty, the state official defendants were not "in violation of federal law at the precise moment when the case was filed") (citation omitted). And, there are no "classic claims of ongoing violations of federally-protected property and liberty rights" in play. Id. at 628; but see Coakley v. Welch, 877 F.2d 304 (4th Cir. 1989) (finding ongoing violation where former state employee alleged he was fired without appropriate due process and sued for the injunctive remedy of restatement).[6]

---

[5] Neither the Complaint nor Chase's briefs were entirely clear on what the alleged ongoing constitutional violation was. When pressed at oral argument, Chase stated that the ongoing violation was her loss of seniority in the Senate and the alleged harm to her reputation and legacy. The Court interprets Chase's answer to refer to her Due Process allegations.

[6] Unlike with certain protected public jobs, the Court is not aware of any constitutionally protected property or liberty interest in a senate seniority ranking. There is no property right in holding public office under the due process clause itself. Snowden v. Hughes, 321 U.S. 1, 7 (1944) ("[A]n unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause."). Nor does there appear to be any such right for a state senator under Virginia law. See VA. CONST. art. IV, § 7 (allowing for the expulsion of a member of the senate upon a two-thirds vote of the elected members of the senate).

Additionally, the relief that Chase seeks is fundamentally retrospective in character because, at its core, Chase's complaint seeks to undo her completed censure by the Virginia Senate. Paraguay, 134 F.3d at 628. Under these circumstances, the Ex parte Young exception does not apply. Nevertheless, as discussed below, even if that were not the case, Schaar would also be protected by absolute legislative immunity.

### B. Absolute Legislative Immunity

"It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities." Bogan v. Scott-Harris, 523 U.S. 44, 46 (1998). This absolute legislative immunity also applies to suits brought pursuant to § 1983, id. at 48-49; see also Tenny v. Brandhove, 341 U.S. 367 (1951), even where the remedy sought is declaratory or injunctive relief. Supreme Court of Virginia v. Consumers Union of the U.S., 446 U.S. 719, 732 (1980).

### 1. Legislative Immunity for Individual Senators

However, the first question to be answered is whether the actions of the individual state senators, in imposing the

---

It is difficult to see how a right to seniority could exist if there is no underlying right to hold public office. And, without an affected property interest, there can be no "stigma plus" claim based on any reputational harm. See, e.g., Monserrate v. N.Y. State Senate, 695 F. Supp. 2d 80, 90 (S.D.N.Y. 2010).

Substitute Censure, would have fallen within the "sphere of legitimate legislative activity."[7] Tenny, 341 U.S. at 376. In examining this question, a court should not "inquire into the motives of legislators." Id. Rather, a court should look to whether the legislators were "acting in a field where legislators traditionally have the power to act," id. at 379, because to find that a legislator "has exceeded the bounds of legislative power[,] it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive." Id. at 378. The Fourth Circuit has held that a legislature's discipline of its own members is a "core legislative act." Whitener v. McWatters, 112 F.3d 740, 741 (4th Cir. 1997). And, that holding would appear to apply even where a plaintiff alleges violations of his or her First Amendment and Fourteenth Amendment Due Process rights. See id. at 745.

In Whitener, the Loudoun County Board of Supervisors voted to discipline one of its members for "confronting other members with abusive language." Id. at 741. Specifically, the Board voted to discipline the member by censuring him and removing him from all of his committee assignments for one year. Id. The chastised member brought a § 1983 suit before the discipline actually went into effect, alleging that his First Amendment and

---

[7] Of course, the individual state senators are not parties to this suit.

13

Fourteenth Amendment Due Process rights were violated. Id. The district court held, and the Fourth Circuit affirmed, that the Board had absolute legislative immunity because "a legislative body's discipline of one of its members is a core legislative act." Id. at 741, 744. According to the Whitener court,

> Even if, at some level, there is a judicially enforceable First Amendment constraint on a legislature's power to discipline one of its members, we certainly do not approach it in this case. Whitener was disciplined for his lack of decorum, not for expressing his view on policy. We cannot conclude that the Loudoun County Board of Supervisors was without power to regulate uncivil behavior, even though it did not occur during an official meeting. Such abusiveness, even when it occurs "behind the scenes," can threaten the deliberative process. Indeed, "the greatest concern over speech within a deliberative body is that members might engage in personal invective or other offensive remarks that would unleash personal hostility and frustrate deliberative consideration."

Id. at 745 (citation omitted).

Of course, in this case, there are two notable differences: first, Chase argues that she was being censured for her political views rather than her lack of civility; and second, Chase alleges that the Senate violated not only the First and Fourteenth Amendments but also its own rules in censuring her. Neither difference necessitates that the outcome of this case differ from that of Whitener.

First, with respect to the motives behind Chase's censure, the question of whether absolute immunity attaches focuses on

14

whether a power is a core legislative act, not on the motives of the individual legislators. And, the Fourth Circuit has squarely held that "a legislative body's discipline of one of its members is a core legislative act." Id. at 741, 744. Thus, this Court will not inquire into the motives of the senators who voted to censure Chase. See Tenney, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege. . . . The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.").

Second, even if there is a point at which a legislature acts so far outside the "the bounds of legislative power" that the state senators should not be able to claim absolute legislative immunity, the cases teach that it has not been reached in this case. Cf. Whitener, 112 F.3d at 745; see also Rangel v. Boehner, 20 F. Supp. 3d 148, 157 (D.D.C. 2013), aff'd, 2015 U.S. App. LEXIS 7610 (D.C. Cir. May 8, 2015), cert. denied, 136 S. Ct. 218 (Oct. 5, 2015) (finding immunity for member defendants under the Speech or Debate Clause despite allegations that the House of Representatives violated its own rules when censuring one of its members). Thus, had the individual senators been named in this suit, they would have been entitled to absolute legislative immunity.

15

### 2. Legislative Immunity for the Clerk of the Senate

Because legislators generally cannot perform their legislative roles without the assistance of aides, legislative immunity extends to the agents of legislators. Gravel v. United States, 408 U.S. 606, 616-17 (1972). Lower courts have extended that premise to find that even legislative employees in administrative roles can be entitled to legislative immunity. See Rangel v. Boehner, 20 F. Supp. 3d at 180 (finding legislative immunity protected the Clerk of U.S. House of Representatives); Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 625 (1st Cir. 1995) (finding legislative immunity protected Rhode Island House of Representatives Door Keeper).

In Rangel, the District Court of the District of Columbia held that immunity applied to, inter alia, the Clerk of the House, where there was no allegation the Clerk engaged in wrongdoing, but the Clerk, as keeper of the House Journal, was essential to part of plaintiff's requested relief (i.e., "an injunction requiring defendants to 'take all necessary steps to vacate, strike and remove the recording of censure, as voted on by the House and as set forth in the Journal'"). Rangel, 20 F. Supp. 3d at 157, 180. In so holding, the Rangel court noted that the maintenance of the journal was a "matter which the Constitution places within the jurisdiction of either House."

16

Rangel, 20 F. Supp. 3d at 180 (quoting Gravel, 408 U.S. at 625). Moreover, "the Clerk was 'acting by virtue of an express delegation of authority as an aide or assistant of Congress' when she recorded Rangel's censure in the House Journal: it is the Clerk's duty to enter the day's business in the Journal." Rangel, 20 F. Supp. 3d at 180 (cleaned up) (citation omitted).

In Harwood, the First Circuit held that an individual responsible for enforcing the rules of the Rhode Island State House of Representatives was protected by legislative immunity where that individual enforced an allegedly unconstitutional House rule (dictating that government lobbyists, but not private lobbyists, could lobby on the floor of the House). Harwood, 69 F.3d at 625. The court held that:

> Where, as here, a legislative body adopts a rule, not invidiously discriminatory on its face . . . that bears upon its conduct of frankly legislative business, we think that the doctrine of legislative immunity must protect legislators and legislative aides who do no more than carry out the will of the body by enforcing the rule as a part of their official duties.

Harwood, 69 F.3d at 631 (citation omitted).

Here, the Court, persuaded by the reasoning in Rangel and Harwood, concludes that legislative immunity extends to Schaar. First, as in Rangel, the Virginia Constitution requires both houses of the General Assembly to maintain a journal of

17

proceedings.[8] Second, as in both Rangel and Harwood, there is no allegation that Schaar committed any wrongdoing. Rather, her job is to act as the agent of the senators in complying with a facially neutral constitutional provision. Cf. Harwood, 69 F.3d at 631. On these facts, Schaar is entitled to partake of the legislative immunity that would have been afforded to the state senators.

Because the Court finds that both Defendants are immune from suit, it is not necessary to address whether this case presents a non-justiciable political question.

## CONCLUSION

For the foregoing reasons, the DEFENDANTS' MOTION TO DISMISS (ECF No. 12) will be GRANTED.

It is so ORDERED.

/s/ RЕР
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 12, 2021

---

[8] "Each house shall keep a journal of its proceedings, which shall be published from time to time. The vote of each member voting in each house on any question shall, at the desire of one-fifth of those present, be recorded in the journal. On the final vote on any bill, and on the vote in any election or impeachment conducted in the General Assembly or on the expulsion of a member, the name of each member voting in each house and how he voted shall be recorded in the journal." Va. Const. art. IV, § 10.